UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DAVID ROBINSON,

                                        Plaintiff,

                        vs.                                    9:08-CV-911
                                                               (J. McAvoy)

NEW YORK STATE DEPARTMENT OF
CORRECTIONAL SERVICES; et al.

                                        Defendants.
_____

DAVID ROBINSON, Plaintiff *Pro Se*
KRISTA A. ROCK, Assistant Attorney General for Defendants

GUSTAVE J. DI BIANCO, United States Magistrate Judge

## REPORT-RECOMMENDATION

This matter has been referred to the undersigned for Report and

Recommendation by the Honorable Thomas J. McAvoy, Senior United States

District Judge, pursuant to 28 U.S.C. § 636 (b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff, a former inmate, alleges that defendants

delayed plaintiff's access to the United States Mail; assigned him to be double-

bunked; subjected him to excessive searches; limited his use of a "warming stove";

harassed him; and refused to address plaintiff's grievances. (Dkt. No. 1 ("Compl.")).

Plaintiff claims that defendants' actions violated the First, Fifth, Sixth, Eighth, Ninth,

Tenth, and Fourteenth Amendments.  Plaintiff cites 42 U.S.C. §§ 1983, 1985, 1986,

1987, and 1988.  Plaintiff also claims that defendants have violated 18 U.S.C.

§§ 241, 242.[1]  Plaintiff seeks injunctive[2] as well as substantial monetary relief.

Presently before the court is defendants' motion to dismiss pursuant to FED. R. CIV. P. 12(b)(6). (Dkt. No. 41).  Plaintiff has filed a response in opposition to the motion. (Dkt. No. 46).  For the following reasons, this court recommends that defendants' motion to dismiss be **GRANTED** and the complaint be dismissed in its entirety.

## DISCUSSION

### 1.   Motion to Dismiss

To survive a motion to dismiss, the plaintiff must provide "the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *Camarillo v. Carrols Corp.*, 518 F.3d 153, 156 (2d Cir. 2008)(quoting *inter alia ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 1965 (2007).  Plaintiff's factual allegations must be sufficient to give the defendant "fair notice of what the claim is and the grounds upon which it rests." *Id.* (citing *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 121 (2d Cir. 2007)).  *See Ashcroft v. Iqbal*, __ U.S. __, 129 S. Ct. 1937, 1949 (May 18, 2009) ("To survive a motion to dismiss, a complaint must contain sufficient factual matter,

---

[1] These statutes are criminal in nature, and there is no private right of action to enforce federal criminal laws. *See Dugar v. Coughlin* 613 F. Supp. 849, 852 n.1 (S.D.N.Y. 1985).

[2] Because plaintiff is no longer incarcerated, any claims for injunctive relief may be dismissed as moot. *See Pugh v. Goord*, 571 F. Supp. 2d 477, 489-90 (S.D.N.Y. 2008)(where an inmate has been released from prison, his claims for injunctive relief based on the conditions of his incarceration must be dismissed as moot).

accepted as true, to state a claim to relief that is plausible on its face.").  When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint. *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007) (citations omitted).

The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich*, 408 F.3d 124, 128 (2d Cir. 2005); *Tapia-Ortiz v. Doe*, 171 F.3d 150, 152 (2d Cir. 1999)(per curiam).  In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)(citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)).

## 2.    Facts

Plaintiff states that he has nine claims in this action.  (Compl. at ¶¶ 112-29).  The complaint is comprised of three parts.  In the first part, plaintiff gives a generally chronological recounting of the events that are the bases of the alleged constitutional violations.  (Compl. at ¶¶ 24-111).  In the second part, plaintiff summarizes his nine causes of action.  (Compl. at ¶¶ 112-29).  The third part of the complaint consists of 52 pages that include copies of his "grievances," legal arguments, and supporting documents for some of his claims.  (Dkt. No. 1, *Exhibits*[3]).  The court will attempt to

---

[3]When filing the complaint on the court's electronic filing system, the Clerk divided the Complaint into two parts.  On the docket, the first part is entitled "Main Document" and includes the first two sections of plaintiff's Complaint as described above.  These sections are consecutive numbered paragraphs 1-159.  On the docket, the second part is entitled "Statement of Facts" and

discuss the facts separately as to each claim.

### A. Interference with Mail

Plaintiff's first two claims (Compl. at ¶¶ 112-13, 114-15) relate to the handling of his mail.  Plaintiff asserts that the New York State Department of Correctional Services ("NYSDOCS"), the Central Office Review Committee ("CORC"), and individual defendants Rivera, Glover, and Jessen[4] violated plaintiff's rights under the First, Fifth and Fourteenth Amendments.  (Compl. at ¶¶ 113, 115).

Plaintiff discusses in detail three instances of problems with his mail, March 16, April 8, and June 5, 2008.  (Compl. at ¶¶ 24, 26, 34).  Plaintiff alleges that on March 16, 2008, he submitted two items to be mailed, one was legal correspondence, and the other personal correspondence.  (Compl. at ¶ 24).   Plaintiff alleges that the legal correspondence "was issued to the Postal Service by defendant Glover, the Senior Mail Clerk, on or about March 19, 2008," but that the personal correspondence was returned to plaintiff on March 28, 2008.  *Id*.  Plaintiff argues that defendant Glover, "unlawfully obstructed/delayed/tampered with plaintiff's correspondence."  *Id*.  Plaintiff alleges that this conduct interfered with his right to correspond and access to the court. *Id*.  Plaintiff states that he submitted a written inquiry, and that defendant Glover responded in writing

---

includes the third 52-page section of plaintiff's Complaint as described above.  While the first page is titled "Statement of Facts," the document appears to be a grievance.  Plaintiff also includes a variety of other documents.  For ease, the court will refer to this as the Exhibits.  The court has numbered the pages consecutively for citation purposes.

[4]George Jessen is listed in the caption of the Complaint, and is mentioned several times in the Complaint.  However, it appears that Mr. Jessen was not listed on the docket in the list of defendants.  Furthermore,  no attempt was made to serve defendant Jessen.

> admitting that she unlawfully obstructed/delayed/tampered with
> plaintiff's afore-stated correspondence.  Attributing her actions upon
> DOCS policy of prohibiting prisoner's access to their accounts the day
> before and the day of prisoner's scheduled commissary date, the busy
> volume of mail due to the approaching holiday and unintended
> negligence on her part.

(Compl. at ¶ 25).

Plaintiff states that the second incident occurred on April 8, 2008.  (Compl. at ¶ 26).  Plaintiff states that he submitted legal correspondence, together with a disbursement form to pay the cost of postage.  *Id*.  Plaintiff states that this piece of mail was not given to the Postal Service for mailing until April 14, 2008.  *Id*.  Plaintiff alleges that defendant Glover was responsible for this delay.  *Id*.  The third occasion was on June 5, 2008.  (Compl. at ¶ 34).  Plaintiff states that he submitted legal correspondence on June 5, 2008, and on June 6, 2008, the correspondence "was rejected by defendant Glover, per directions of defendant Jessen."  *Id*.  Plaintiff argues that this was an unlawful rejection of his correspondence.  *Id*. at ¶ 35.

In addition to the three incidents detailed above, plaintiff also lists approximately eight other occasions where submission of his mail to the United States Postal Service was delayed[5].  (Compl. at ¶ 32).

| Date Submitted by Plaintiff/Day | Type of Correspondence | Date Submitted to U.S.P.S./Day |
| --- | --- | --- |
| April 28, 2008/Mon. | Legal | May 2, 2008/Fri. |
| May 29, 2008/Thurs. | Legal | June 2, 2008/Mon. |

---

[5]Plaintiff did not include information about what day of the week he submitted his mail to the Mail Clerk.  The court was able to reconstruct that information based on a calendar.

5

| | | |
|---|---|---|
| June 5, 2008/Thurs. | Legal | June 9, 2008/Mon. |
| June 8, 2008/Sun. | Legal | June 12, 2008/Thurs. |
| June 19, 2008/Thurs. | Legal | June 23, 2008/Mon. |
| July 3, 2008/Thurs. | Legal | July 7, 2008/Mon. |
| July 3, 2008/Thurs. | Legal | July 10, 2008/Thurs. |
| July 15, 2008/Tues. | Legal | July 18, 2008/Fri. |

*Id*. Plaintiff submits a number of completed forms titled "Disbursement or Refund Request," which appear to be the forms used by inmates to draw on their available funds to pay for postage. (Dkt. No. 1, *Exhibits* at 4, 6, 8, 11-15)(IAS-*2706* Forms). The forms are largely illegible, but generally seem to confirm that plaintiff submitted these forms with his correspondence to pay for the postage. *Id*.

Plaintiff basically alleges that defendant Glover violated NYSDOCS policy requiring all mail to be processed and delivered to the United States Postal Service "the next day." (Compl. at ¶ 33). Plaintiff claims that defendants were "practicing" a policy, requiring the approval of his disbursement form prior to issuing the inmate any required postage for mail. This policy prevented an inmate who was attempting to purchase postage from accessing his account for three days if he had purchased something from the commissary. (*Id.* at ¶ 30). Plaintiff claims that, as a result of this "practice," his mail was delayed until the IAS-*2708* advance form was approved.

### B. "Double-Bunking"

Plaintiff states that his third cause of action is against defendants State Commission on Corrections ("SCOC"), NYSDOCS, Rivera, and Neuwirth. (Compl. at ¶ 116). Plaintiff states that on March 26, 2008, he submitted a request to

6

defendant Supt. Rivera to be moved to a "single" cell.  (Compl. at ¶ 37).  Plaintiff

claims that his assignment to double-bunked cell was unlawful and discriminatory.

*Id*.

Plaintiff states that on April 1, 2008, he met with defendant Neuwirth to

discuss the double-bunking.  (Compl. at ¶ 38).  During the conversation, defendant

Neuwirth asked plaintiff "for specific statutes prohibiting double-bunking."  *Id*.

Plaintiff gave a general answer that it was the obligation of the employees of the

correctional facility to understand the statutes that govern the policies at the facility.

*Id*.  Plaintiff states that defendant Neuwirth threatened to give plaintiff a ticket for

refusing a direct order.  *Id*.  Plaintiff claims that he was not refusing a direct order,

but needed time research the issue.  *Id*.  Plaintiff states that defendant Neuwirth then

threatened to issue a Misbehavior Report.  *Id*.

Plaintiff filed a grievance on May 16, 2008 to complain about defendant

Neuwirth's conduct, and about plaintiff's housing situation.  (Compl. at ¶ 42).

Plaintiff states that his "grievance has not been disposed, unlawfully suppressed."

*Id*. at ¶ 50.  Plaintiff argues that

> SCOC issued a variance in accordance with the relevant statute of
> NYCRR, (Double occupancy housing units originally designated for
> double occupancy), which unlawfully allowed Wallkill to convert 72
> units to house two inmates.  Wallkill;s [sic] units are not double
> occupancy units originally designated and constructed for double
> occupancy, rendering SCOC's variance, void and unlawful on its face.

*Id*. at ¶ 43 (emphasis in original).  Plaintiff further argues that these conditions

subject "all Wallkill prisoners" to standards that are "below the minimum standards

governing other state prisoners." *Id*. at ¶ 48.

7

### C.  Cell Searches

Plaintiff's fourth cause of action is against defendants Rivera, Amado, Jessen, Calender[6], and Scott.  (Compl. at ¶ 118).  However, in plaintiff's statement of this claim, he includes allegations against defendant Neuwirth.

Plaintiff states that his "living quarters and property" were searched by defendant Scott on March 20 and March 26, 2008. (Compl. at ¶ 52).  On March 26, 2008, he asked defendant Amado to provide plaintiff with "copies of the documents that authorized these searches." *Id*.  Plaintiff states that on March 29, 2008, he met with defendant Calender, and plaintiff was informed that random searches were selected by computer program. *Id*.  Plaintiff stated that he informed defendant Calender that the searches were too frequent, and the policy authorizing them was unlawful. *Id*.

Plaintiff states that his "living quarters and property" were searched again by defendant Scott on May 7, 2008, allegedly authorized by defendant Calender. (Compl. at ¶ 53).  Plaintiff states that he filed a grievance, and that the grievance "has not been disposed, unlawfully suppressed." *Id*.  Plaintiff states that he witnessed frequent searches of other inmates, and that this issue of "perpetual, harassing searches" was brought up at the Inmate Liaison Committee, which took the issue up with defendants Rivera, Amado, Jessen, and Neuwirth, during the May 29, 2008 meeting. *Id*. at ¶ 54.  Plaintiff states that his quarters were also searched on May 20,

---

[6]Defendant Calender was not served with process.  A summons in his name was issued in November 2008 (Dkt. No. 12), but was returned unexecuted in March 2009 (Dkt. No. 42).  The docket indicates that service was not attempted a second time.

June 18, June 22, July 24, August 6, August 7, and August 13, 2008.  (Compl. at ¶ 55).

### D.  Warming Stove Privileges

Plaintiff's fifth and sixth claims are about three separate revocations of the privilege to use warming stoves.  (Compl. at ¶¶ 120-23).  The fifth cause of action names defendants Rivera, Amado, Scott, and Calender.  *Id*. at 120-21.  The sixth cause of action names only defendant Marrero.[7]  *Id*. at 122-23.  Plaintiff states that Wallkill Correctional Facility allows the use of warming stoves.  He argues that "[r]evocation of this privilege, must be in accordance to a constitutionally sound policy, and never be arbitrary or caprious [sic], or administered for the purpose of retaliation or revenge."  (Compl. at ¶ 59).  Plaintiff challenges the method by which the warming stove privileges were revoked, claiming that defendants' actions did not comply with due process.

Plaintiff states that he first lost his warming stove privileges during January, when the facility revoked the warming stove privilege "of the entire AB Wing 1, 2, 3, arbitrarily depriving 300 prisoners of secured privileges . . . ."  (Compl. at ¶ 65).  Plaintiff argues that because defendant Amado "has the overall charge of the security of the facility," his approval of the revocation of privileges "was mandatory."  *Id*. at ¶ 66.

Plaintiff states that on June 23, 2008, defendant Calender informed the population of "AB1" that "use of the stoves would be restricted for at least a week,

---

[7] This defendant was also not served with process.

due to defendant Scott's report that someone put a substance on the supply room door knob . . . ." (Compl. at ¶ 60). Plaintiff states that he explained to defendant Calender that there was a long "list of suspects" who could have put the substance on the door knob. *Id.* at ¶ 61. Defendant Calender "replied that it is <u>his practice</u>, when he cannot identify the individual guilty of misconduct, he punishes the population, as to pressure the population to find and address the 'guilty' individual."[8] *Id*. at ¶ 61-62 (emphasis in original).

Plaintiff states that on the same day that the substance was found on the door knob, an "AB1 porter, admitted to defendant Scott that, he was the individual who inadvertently, put cleaning substance from his glove on the supply room door knob, when he entered the closet to get a mop head." (Compl. at ¶ 67). Plaintiff states that notwithstanding the porter's admission, the Wallkill staff, "with vindictiveness and no justification" still deprived plaintiff and 100 other prisoners of their stove privilege for (7) days." *Id*.

Plaintiff states that he filed a grievance about the loss of warming stove privileges with defendant Supt. Rivera on June 25, 2008. (Compl. at ¶ 70). Plaintiff alleges that the grievance "was not disposed, unlawfully suppressed." *Id*.

Plaintiff states that the third occasion that he lost his privilege to use a warming stove was between July 29 and August 2, 2008. (Compl. at ¶ 71). Plaintiff alleges that defendant Marrero revoked the use of the stoves because they were not

---

[8] Plaintiff also states that on June 25, 2008, he complained about the warming stove privileges to Lieutenant Baker, who is not named as a defendant in this action. (Compl. at ¶ 63). Plaintiff claims that Lieutenant Baker confirmed that it was also his practice to punish the entire population when the guilty individual could not be identified. *Id.* at ¶ 64.

clean.  *Id*.  Plaintiff states that it is the duty of the "assigned porter" to clean the stoves, and that when the stoves are not cleaned, the policy is to issue a Misbehavior Report.  *Id*.  Plaintiff argues that instead of issuing a Misbehavior Report to the porter, defendant Marrero unlawfully revoked the privilege to use the stoves.  *Id*.

### E.  Harassment

Plaintiff's seventh cause of action alleges harassment of plaintiff, and names defendants Rivera, Roy, Amado, Holmes, Valuc[9], Marrero, Curfman, Galbally, Heal, Dunham, and Chenneham[10].  (Compl. at ¶ 124).

Plaintiff alleges that on May 5, 2008, defendant Heal approached plaintiff and instructed him to step outside of the mess hall.  (Compl. at ¶ 73).  Plaintiff alleges that defendant Heal stated that he suspected plaintiff was carrying a weapon on the string of plaintiff's pants.  *Id*.  Plaintiff showed defendant Heal the string which held a key to plaintiff's room.  *Id*.  Plaintiff states that defendant Heal conducted a search of plaintiff "before the view of at least (20) prisoners waiting to enter the messhall and the messhall duty Sgt, Burns [sic]."  *Id*.  Plaintiff argues that once defendant

---

[9]This defendant was not served with process.  The docket does not indicate when a summons was issued, but the docket shows that as to Mr. Valuc, the summons was returned unexecuted in December 2008 (Dkt. No. 18).  The Clerk's Office wrote to plaintiff, and explained that there was no Lt. Valuc employed by Wallkill Correctional Facility.  The clerk suggested another possible name of this particular defendant.  (Dkt. No. 40).  Plaintiff was also provided with an additional USM-285 form in order to effect service on the potential defendant. *Id*.  Plaintiff did not respond to the court's letter.

[10]This defendant was not served with process.  A summons was issued for this defendant in November 2008.  (Dkt. No. 12).  The summons was returned unexecuted in December 2008 (Dkt. No. 19).  The Clerk's Office wrote to plaintiff, and explained that there was no employee with a last name of "Chenneham" employed at Wallkill Correctional Facility.  (Dkt. No. 40). The clerk asked plaintiff if he had any other identifying information about this defendant.  *Id*. Plaintiff was also provided with an additional USM-285 form in order to effect service on the potential defendant.  *Id*.  Plaintiff did not respond to the court's letter.

Heal saw that the string on plaintiff's pants held only a key, defendant Heal had no reason to search plaintiff. *Id.* at ¶ 74.  Plaintiff argues that the reason for the search was "to abuse [defendant Heal's] Official Capacity to quench his individual desire to harass/intimidate and retaliate against plaintiff for filing grievances/ complaints against his co-workers." *Id*.  Plaintiff states that he filed a grievance with defendant Supt. Rivera, but that the "grievance was never disposed, unlawfully suppressed." *Id*.

Plaintiff states that after he filed the grievance regarding the May 5, 2008 search, defendant Heal

> in retaliation conspired with other officers (who are soon to be charged), by lambasting him with a barrage of threatening, reckless eyeballing and hostile/profane language/jester.  Previous documented complaints/ grievances lodged by other prisoners against defendant Heal, in addition to the fact that Heal, reported to work for (3) weeks.  With blackened eyes, which were the obvious result of an off duty fight.  Clearly exhibits that defendant Heal, lacks a disposition which is conducive to the discharge of his duties of Correction Officer.

(Compl. at ¶ 75).  Plaintiff states that he filed an additional grievance complaint on May 16, 2008 with defendants Amado and Roy as to defendant Heal's "conspiracy" with other officers "to harass/intimidate plaintiff in retaliation to grievance submitted by plaintiff." *Id*. at ¶ 78.  Plaintiff argues that defendants Amado and Roy "neglected to Prevent these and future acts of retaliation." *Id*. at ¶ 77.

Plaintiff states one instance of retaliation occurred on May 21, 2008 during the 9:30 p.m. count of the inmates. (Compl. at ¶ 79).  Defendant Heal conducted the count, and "stopped in front of plaintiff's room, stood there for 30 seconds looking

into the room, while writing on a clipboard.  Then defendant Dunham, on her

"swing" of the count, stopped and stood in front of plaintiff's room, looking in the

room for 30 seconds while writing on a clipboard."  *Id*.  Plaintiff states that he

attempted to ask defendant Heal if they could speak, but that defendant Heal "replied

in a hostile/ profane manner, get the [expletive] out of here, stop harassing me,

before I give you ticket." *Id*. at ¶ 80.  Plaintiff then states that he approached

defendant Dunham, and asked if there was a problem with his room during the count.

*Id*.  "Dunham replied are you harassing me.  Plaintiff said no more and returned to

his room." *Id*.  Plaintiff states that he filed a grievance on this issue, but that it was

"never disposed, unlawfully suppressed." *Id*. at ¶ 81.

Plaintiff states that defendant Heal issued a Misbehavior Report on May 21,

2008 to retaliate against plaintiff for filing the grievance and the May 16, 2008

complaint to defendants Amado and Roy.  (Compl. at ¶ 82).  Plaintiff states that

defendant Dunham signed the Misbehavior Report as a witness.  *Id*.  Plaintiff argues

that defendants Dunham and Heal committed "perjury by falsely, fabricating charges

in order to retaliate against plaintiff for filing grievances, and May 16, 2008

complaint." *Id*.  Plaintiff alleges that defendant Holmes "approved" the retaliatory

Misbehavior Report. *Id*.

Plaintiff states that he was called to defendant Galbally's office on May 23,

2008 to discuss the Misbehavior Report filed by defendant Heal. (Compl. at ¶ 84).

Plaintiff stated that the Misbehavior Report should be dismissed as retaliatory. *Id*.

Plaintiff argues that defendant Galbally neglected his official duty when he failed to

dismiss the Misbehavior Report and commenced a hearing on the Report.  *Id*. at

¶ 86[11].  Plaintiff states that he requested the opportunity to present witnesses, but that

defendant Galbally stated that the rules for a Tier I hearing did not afford plaintiff the

opportunity to present witnesses, or for the hearing to be recorded.  *Id*.

Plaintiff alleges that defendants Heal and Dunham harassed plaintiff while

conducting the inmate count, "then conspired to fabricate a fraudulent report to

cover-up their improprieties and retaliate."  *Id*.  Plaintiff argues that defendant

Galbally's "affirmation of the fraudulent report affirms his part of the conspiracy by

officers."  *Id*. at ¶ 87.  Plaintiff further argues that since defendants Rivera and

Amado were "properly appraised [sic] of the improprieties of their subordinates, [and

they] neglected to curtail this unlawfulness affirms that they condone the conspiracy

to retaliate."  *Id*.

Plaintiff states that he filed a grievance with defendant Rivera on May 24,

2008 regarding the Tier I Disposition, but he received no relief. (Compl. at ¶ 88).

Plaintiff argues that defendants Rivera, Amado, Holmes, Galbally, Heal, and

Dunham "conspired to harass/intimidate, issue/affirm fraudulent retaliatory

misbehavior report, defraud plaintiff's rights to substantive/procedural due process to

grieve/ appeal, present evidence in his favor, equal protection, subjecting cruel [sic]

and unusual punishment."  *Id*.

Plaintiff alleges another instance of harassment that occurred on July 5, 2008,

when defendants Heal and Curfman "directed Threatening stares/Gestures upon

---

[11]There is no Paragraph 85.

plaintiff." (Compl. at ¶ 89). Plaintiff states that as he was leaving the mess hall, defendant Curfman "accosted plaintiff, threateningly, screaming with hostility, pull your pants up." *Id*. Plaintiff states that six other Corrections Officers laughed at plaintiff, and that defendant Heal's laughter was the loudest. *Id*. Plaintiff argues that defendant Curfman's behavior on the morning of July 5, 2008 "confirms that he conspired" with defendant Heal. *Id*. Plaintiff argues that defendants Roy and Amado violated plaintiff's civil rights "by their willful Neglect to Prevent, the perpetual campaign to threaten, harass, intimidate plaintiff in retaliation, as substantiated in numerous afore-mentioned grievances, by plaintiff all of which have been WHITE WASHED." *Id*. at ¶ 90.

Plaintiff next alleges that defendant Curfman harassed plaintiff by implementing "his own unlawful policy/custom of arbitrarily prohibiting plaintiff/ Wallkill prisoners from taking rolls, buns, biscuits. i.e. bread [sic] from the messhall." (Compl. at ¶ 91)(emphasis in original). Plaintiff asserts that the Wallkill Facility Guide states that bread may be taken out of the mess hall at the noon and evening meals. *Id*. It is unclear when defendant Curfman allegedly engaged in the enforcement of his policy about the bread.

In the next paragraph, plaintiff states that on July 10, 2008, plaintiff was summoned to defendant Marrero's office for a hearing regarding a grievance about the bread. (Compl. at ¶ 92). Much of this section of plaintiff's complaint references the Ku Klux Klan, and refers to some defendants as "Grand Wizard", "Regional Grand Wizard", or other combinations of defendants' title and Ku Klux Klan

references.  Plaintiff states, in essence, that the grievance was never resolved.  *Id.*

Plaintiff also states that defendant Marrero conducted the grievance hearing, and that in Marrero's opinion, "the fact that no one made any racist remarks, shows that grievance is an unsubstantiated, anger fueled, written document that no court would believe."  *Id.*  Plaintiff states that another instance of harassment occurred on July 7, 2008 at around 8:00 a.m., while plaintiff walked toward the "P.C. window" in the basement.  (Compl. at ¶ 94).  Plaintiff states that defendant Chenneham "physically bumped" into plaintiff.  *Id.*

Plaintiff states that the next instance of harassment occurred on July 12, 2008 around 12:30 p.m., when he was on the telephone.  (Compl. at ¶ 94).  Plaintiff states the defendant Valuc "fraudulently stat[ed]" to defendant Scott that plaintiff had his feet on the wall, and that plaintiff should have to paint the wall.  *Id.*  Plaintiff argues that defendant Valuc has become "the latest Nazi, to abuse his Official Capacity, by cracking the whip of Unlawful Slave Labor, in order to degrade, harasss, and intimidate plaintiff in retaliation."  *Id.*  Plaintiff argues that the defendants act with "impunity, which fuels their recklessness, to the inevitable point of assaulting plaintiff."  *Id.* at ¶ 96.  Plaintiff argues that his personal safety is threatened by "the escalating campaign of harassment, intimidation, threats, physical abuse, MUST BE CURTAILED."  *Id.* at ¶ 97.

### F.  Grievances

Plaintiff's eighth cause of action is against defendants CORC, Rivera, Henn, and Scott.  This claim includes several allegations about how defendants handled

plaintiff's grievances.  Plaintiff alleges that defendant Rivera "willfully pervert[ed] state statute [sic] governing Inmate Grievance Program, by unlawfully suppressing all grievances submitted to him by plaintiff."  (Compl. at ¶ 98).

Plaintiff states that on June 17, 2008, he submitted to CORC all of the grievances that plaintiff had submitted up until that date (May 5, May 8, May 16, May 16 (complaint), May 21, May 24 (grievance and complaint), and June 8, 2008). (Compl. at ¶ 98).  Plaintiff states that defendant CORC rejected the group of documents and returned them to plaintiff.  *Id*.

Plaintiff states that his copies of correspondence from the CORC and his grievances were stolen by defendant Scott on May[12] 13, 2008.  (Compl. at ¶ 100). Plaintiff states that this theft occurred "under the guise of a 'random search'".  *Id*. Plaintiff alleges that Defendants Rivera, Henn, CORC, conspired to willfully deprive plaintiff of his constitutional rights by unlawfully suppressing his grievances. *Id*. at ¶ 101.

### G.  NYSDOCS

Plaintiff's ninth cause of action names only NYSDOCS. (Compl. at ¶ 128). Plaintiff argues that the policy of electronic monitoring of prisoners' telephone conversations violates plaintiff's federal constitutional and state statutory rights. (Compl. at ¶ 103).  Plaintiff also alleges that he was the subject of an investigation, involving electronic surveillance of his telephone conversations. *Id*. at ¶ 104.

---

[12]Plaintiff wrote "May," but this may have been a typographical error.  Plaintiff alleges that the theft took place after August 10, 2008, when plaintiff submitted certain documents to Wallkill's business office that indicated that plaintiff had begun this civil action.

Plaintiff also makes some claims that there were undercover "agents" and inmate "agents" conspiring to fabricate charges against plaintiff. *Id.*  Plaintiff states that, as a result, his spiritual, mental, and physical well-being were in "clear and present danger." *Id*.  Plaintiff requested that the court initiate an investigation into the matter.[13] *Id*. at ¶ 105.

### 3.    <u>Eleventh Amendment Immunity</u>

It is well-settled that the state itself cannot be sued under section 1983. *Komlosi v. New York State OMRDD*, 64 F.3d 810, 815 (2d Cir. 1995)(citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989)).  This is true whether the court is considering Eleventh Amendment immunity or a statutory interpretation of section 1983. *Id.* at 815 n.3.  This immunity also applies to suits against state agencies.  *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984) (holding that "in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment."); *Burnette v. Carothers*, 193 F.3d 52, 57 (2d Cir. 1999), *cert. denied*, 531 U.S. 1052 (2000).

However, a state official acting in his official capacity may be sued in a federal forum ***to enjoin conduct*** that violates the federal Constitution, notwithstanding the Eleventh Amendment bar.  *Papasan v. Allain*, 478 U.S. 265, 276-77 (1986); *Pennhurst*, 465 U.S. at 102; *Hutto v. Finney*, 437 U.S. 678, 692 (1978).  Under *Edelman v. Jordan*, "a federal court's remedial power, consistent with the Eleventh

---

[13] As stated above, plaintiff has been released from custody, and therefore, any requests for injunctive relief may be dismissed as moot. *Pugh*, 571 F. Supp. 2d at 489-90.

Amendment, is necessarily limited to prospective injunctive relief . . . and may not include a retroactive award which requires the payment of funds from the state treasury." *Edelman v. Jordan*, 415 U.S. 651, 677 (1974).

NYSDOCS and SCOC are both state agencies.[14]  These agencies are entitled to Eleventh Amendment immunity, and thus, the claims against the New York State Department of Correctional Services and the State Commission of Corrections should be dismissed.  Additionally, the claims against the remaining defendants in their "official" capacities, should be dismissed to the extent that plaintiff sues them for money damages.

This court recommends dismissal of plaintiff's ninth claim, and all other claims against NYSDOCS and SCOC, and the court also recommends dismissal of the claims against the remaining defendants in their official capacities, to the extent that plaintiff seeks money damages.  Although the plaintiff's claims for injunctive relief would not necessarily have been barred by the Eleventh Amendment, plaintiff has been released from incarceration, thus, as stated above, any claims for injunctive relief must be dismissed as moot. *Pugh*, 571 F. Supp. 2d at 489-90.

**4.    Service of Process**

The Federal Rules require that a defendant be served within 120 days of filing the complaint. FED. R. CIV. P. 4(m).  The failure to serve a defendant within 120 days

---

[14]It appears that the court issued a summons for the DOCS Central Office Review Committee ("CORC").  (Dkt. No. 12).  The CORC is a Committee within DOCS, it is neither an agency of the state, nor is it a "branch" of an agency.  Thus, the CORC is not an entity that can be served.  The court agrees with defendants that even if service on CORC had been somehow effected, plaintiff's claims against CORC would be barred by the Eleventh Amendment.

of filing the complaint may be a ground for dismissal of the complaint unless good cause is shown for an extension of that time. *Id.* A dismissal may be initiated by motion or *sua sponte* by the court after notice to plaintiff. *Id.* Generally, if the court chooses to dismiss the action against the unserved defendants, the dismissal must be without prejudice. *Id.*

In this case, defendants C.O. Chenneham; Sgt. Calender; Lt. Valuc; Lt. Marrero; and the CORC have not been served with process. As stated above, the CORC may not be named as a defendant in any event, thus, the court will recommend dismissal with prejudice as against the CORC. On December 22, 2008 and February 12, 2009, the Clerk wrote to plaintiff explaining that defendants Marerro, Valuc, and Chenneham had not been served and explaining potential reasons for the failure of service. (Dkt. Nos. 39- Def. Marerro, 40- Defs. Valuc & Chenneham). On March 6, 2009, the summons was returned "unexecuted" as to defendant Calender, and plaintiff was informed that he must notify the Marshal's Service if plaintiff wished any further attempt to serve this defendant. (Dkt. No. 42 at 2).

Plaintiff has taken no further steps to serve these defendants, notwithstanding the court's letters and the Marshal's notice. Thus, this court will recommend dismissal as to defendants Calender, Valuc, Marerro, and Chenneham for failure to serve.[15]

---

[15] Understandably, the moving defendants did not include the unserved defendants in their motion. However, the arguments made by the moving defendants also justify dismissal as to the unserved defendants. Thus, although the court recommends dismissal against these defendants for failure to serve, the court also finds that it would have recommended dismissal as against

## 5.   **Interference with the Mail**

Plaintiff alleges that delays in processing his mail have violated his constitutional rights under the First, Fifth, and Fourteenth Amendments.  Under the First Amendment, prisoners have a right "to the free flow of incoming and outgoing mail." *Johnson v. Goord*, 445 F.3d 532, 534 (2d Cir. 2006)(citing *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003)).  A prisoner's right to receive and send mail may, however, be regulated.  *Davidson v. Mann*, 129 F.3d 700, 702 (2d Cir. 1997).  A regulation affecting an inmate's attempt to send or receive mail "is valid if it is reasonably related to legitimate penological interests." *Rodriguez v. James*, 823 F.2d 8, 12 (2d Cir. 1987)(quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)).

"In balancing the competing interests implicated in restrictions on prison mail, courts have consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail."[16] *Davis*, 320 F.3d at 351 (citing *Thornburgh v. Abbott*, 490 U.S. 401, 413 (1989); *Washington v. James*, 782 F.2d 1134, 1138-39 (2d Cir. 1986); *Davidson v. Scully*, 694 F.2d 50, 53 (2d Cir. 1982)).  Interference with ***legal*** mail may implicate a prisoner's right to access to the courts as guaranteed by the First and Fourteenth Amendments. *Davis*, 320 F.3d at 351.  A denial of access to courts, however, requires an additional

---

these defendants in any event.

[16] Generally, when the issue involves only censorship or tampering with legal mail as opposed to an alleged denial of access to courts, the inmate alleges that the defendants either read his mail, censored his mail, or otherwise interfered with the mail. *Davis, supra.*  Outgoing mail, whether legal or personal is entitled to greater protection from review or censorship because of the lesser security concerns presented. *Id.* at 532 (citing *Thornburgh*, 490 U.S. at 413).

finding of "actual injury." *Lewis v. Casey*, 518 U.S. 343 (1996).  Plaintiff must show that a non-frivolous legal claim was frustrated or impeded due to the actions of prison officials. *Warburton v. Underwood*, 2 F. Supp. 2d 306, 312 (W.D.N.Y. 1998)(quoting *Lewis v. Casey*, 518 U.S. at 353).

### A.  Correspondence Regulations

In this case, plaintiff alleges only that his mail was delayed pursuant to a practice whereby an inmate is denied "access to his account" for three days while a commissary purchase is processed.  Although plaintiff alleges one delay regarding non-legal mail, most of his complaints involve a delay in processing his legal mail. Plaintiff claims that this "practice" violates the DOCS policy requiring all mail to be processed to the postal service "the next day."

The DOCS Directives governing both "general" and "privileged" correspondence outline the procedures required to obtain postage for outgoing mail. DOCS Directive Nos. 4421, § 721.3(a)(3)[17] (privileged), 4422(III)(D)[18](general).  If an inmate has sufficient funds in his inmate account, he may purchase postage for both personal and legal (privileged) correspondence through the sale of stamps in the commissary. DOCS Directive No. 4422(III)(D)(1)(c).  In certain circumstances, an inmate may purchase stamps by attaching an IAS-2706 Form to a letter. *Id.* 4422(III)(D)(1)(d).  The IAS-*2706* is a form that requests disbursement from an

---

[17] Directive 4421 is a copy of the New York State Regulations governing correctional services. N.Y. CODE RULES & REGS. (NYCRR), tit.7 §§ 721.1-.3.

[18] The information contained in Directive 4422 is also contained in 7 NYCRR §§ 720.2-720.8.

inmate's existing account *if there are sufficient funds*.

An inmate is entitled to a weekly free postage allowance for privileged correspondence. DOCS Directive No. 4421 § 721.3(a)(3)(ii).  If an inmate does not have sufficient funds for the purchase of postage,[19] he is entitled to obtain an advance from the facility for a certain amount of postage for ***privileged*** correspondence, including legal mail by submitting an IAS-***2708*** Form with his request. DOCS Directive No. 4421 § 721.3 (a)(3)(iv)(a)-(c).  Another Directive governs the procedure for obtaining funds when the inmate is in need of photocopying services. DOCS Directive No. 4483(III)(I).  This Directive provides that photocopying requests must be accompanied by either an IAS-2706 Form (for disbursements) or an IAS-2708 Form (for advances).[20]  *Id.*  The Directive warns that the inmate must receive the requested photocopies within five business days, however "[t]wo day commissary holds, where applicable, might increase the delivery deadline to seven days." *Id.*

It appears that, as plaintiff claims, an inmate's request for funds for postage or other disbursements may be delayed when there has been a commissary purchase. Plaintiff submits a completed form dated March 26, 2008 titled "Inmate Accounts," stating that his money was "held for Commissary for 2 days." (Dkt. No. 1, *Exhibits* at

---

[19] The court would note that in order to utilize the IAS-2708 Form to obtain an advance of funds, the inmate must meet additional conditions that are specified in the Directive. DOCS Directive No. 4421 § 721.3 (a)(3)(iv)(a)-(c).

[20] Directive No. 2788 provides the procedure for collection and repayment of money due from inmates as the result of advances or other obligations. Directive No. 2788(III).  This Directive has specific sections that relate to postage. *Id.* Directive No. 2788(III)(A)(1)-(3).

5).  The form also states that as soon as plaintiff's money was "released," his postage and disbursement requests were processed immediately. *Id.*  Another of plaintiff's exhibits is a letter from defendant Glover, dated March 25, 2008, stating that when she received plaintiff's mailings, he had insufficient funds to cover the postage, and that she was unable to contact plaintiff for him to complete the "advance form for [his] Legal mailing". (Dkt. No. 1, *Exhibits* at 7).  The court notes that defendant Glover's letter states that she sent out plaintiff's legal mail in any event, but that there was an error regarding a personal mailing. *Id.*  In response to plaintiff's grievance, the Superintendent stated that "[t]he state accounting system that is currently in place prevents an inmate from overspending his account before a commissary buy." (*Id. Exhibits* at 9).

To the extent that plaintiff challenges the Directives regulating how the facility processes mail and the policy of holding an inmate's request for disbursement until his account can be cleared, these regulations are not unreasonable.  Holding an inmate's request for funds for a short period of time to make sure that he has sufficient funds to cover the disbursement is reasonably related to legitimate penological interests and the administration of the inmate account system.[21]  The delays cited by plaintiff are not excessive, and in themselves do not rise to the level of First Amendment violations.

Plaintiff also alleges that his account was ***improperly*** labeled as having insufficient funds for postage, when, in fact, he did possess sufficient funds. (Dkt.

---

[21] The court would simply point out that non-prisoners must often wait for accounts to clear prior to banks disbursing funds.

No. 1, *Memo*. at 2).  Plaintiff claims that Defendant Glover "willful[ly] violat[ed]"
his rights.  However, during the investigation of plaintiff's grievance, defendant
Rivera found that "[a]ny delay in the grievant's personal outgoing mail being
processed is attributed to human error and no malice by staff can be substantiated."
(Dkt. No. 1, *Memo*. at 9).  Similarly, the CORC stated that any delay was
"inadvertent." *Id*. at 10.  An inadvertent or negligent delay in processing plaintiff's
mail would not rise to the level of a constitutional violation.[22] *See Daniels v.
Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983).

## B.  Access to Courts

Because plaintiff claims that his legal mail was delayed, he also alleges that
defendants violated his right to access the courts. (Compl. at ¶¶ 24, 26, 32, 34).
Though plaintiff alleges delays,[23] and perhaps inconvenience, he has not alleged ***any
actual harm*** to any legal action, resulting from the alleged delays.  Plaintiff has not
argued that defendants' conduct resulted in the dismissal of an otherwise meritorious
legal claim.  Without an actual injury, plaintiff has not stated a claim that can survive
this motion to dismiss. *Lewis v. Casey, supra.*   Mere "delay in being able to work on
one's legal action or communicate with the courts does not rise to the level of a

---

[22] Plaintiff alleges that DOCS had a policy whereby all mail was to be processed by "the
next day," however, he cites no statutory or regulatory basis for this requirement.  Even if DOCS
had a policy that encouraged the immediate processing of an inmate's mail, the violation of a
DOCS policy would not necessarily violate plaintiff's constitutional rights. *See Salahuddin v.
Coughlin*, 781 F.2d 24, 27 n. 4 (2d Cir. 1986)("[e]very violation of state law is not necessarily a
denial of constitutional right").

[23] The longest delay alleged by plaintiff was seven days. Compl. ¶ 32.  Most of the delays
were four days, one was three days, and one was six days. *Id.*

constitutional violation." *Jermosen v. Coughlin*, 877 F. Supp. 864, 871 (S.D.N.Y. 1995) (citing *Jones v. Smith*, 784 F.2d 149, 151-52 (2d Cir. 1986)).

Plaintiff does claim that one piece of legal mail "was rejected by defendant Glover", and that the mail was returned to plaintiff. (Compl. at ¶ 35). However, plaintiff does not state that he was ultimately unable to mail that one piece of legal correspondence, and he does ***not*** allege any harm to a pending action as the result of this alleged "rejection."

Based upon the complaint and the documents attached, plaintiff fails to state a constitutional violation associated with either his right to send and receive mail or his access to courts. Thus, plaintiff's claims relating to the processing of his mail should be dismissed.

## 6.   __Double-Bunking__

Plaintiff claims that his assignment to "double-bunked quarters is unlawful/ discriminatory." (Compl. at ¶ 37). Plaintiff is challenging a "variance"[24] issued to Wallkill, allowing the facility to convert single occupancy cells to double occupancy. Plaintiff claims that this variance was unconstitutional, subjecting "all Wallkill prisoners" to standards "below the minimum standards governing other state prisoners." *Id*. at ¶ 48.

The Supreme Court has held that "double celling"[25] is generally permissible

---

[24] It is unclear what plaintiff means when he states that Wallkill was issued a "variance," however, because this is a motion to dismiss, the court assumes the truth of plaintiff's statement for purposes of this report.

[25] Double-celling involves housing two inmates in a cell that was originally designed for one person. *Jones v. Goord*, 435 F. Supp. 2d 221, 227 (S.D.N.Y. 2006).

under the Eighth and Fourteenth Amendments. *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981).  There is no "one man, one cell" principle embodied in the Constitution. *Bell v. Wolfish*, 441 U.S. 520, 542 (1979).  However, combined with other adverse conditions, double-celling may amount to an Eighth Amendment violation. *Bolton v. Goord*, 992 F. Supp. 604, 626 (S.D.N.Y. 1998).  In order to violate the constitutional prohibition against cruel and unusual punishment, the conditions of confinement must result in an "unquestioned and serious deprivation of basic human needs," and the defendants must have imposed those conditions with "deliberate indifference." *Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996)(citing *Wilson v. Seiter*, 475 U.S. 312, 319-20 (1986); *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985)).

In *Jones v. Goord*, the court analyzed the double-celling issue at length. *Jones v. Goord*, 435 F. Supp. 2d 221 (S.D.N.Y. 2006).  *Jones* was a class action case in which plaintiffs challenged a double-celling program that was instituted in New York State due to a large increase in prison population. *Jones*, 435 F. Supp. 2d at 228.  Plaintiffs argued that the practice deprived inmates of the "minimal civilized measure of life's necessities." *Id.*  Plaintiffs claimed that New York's double-celling policy violated the Eighth Amendment because of "the general conditions of confinement in double cells, the risk of inmate against inmate violence, injury and disease, and secondhand smoke." *Id*. at 236.  The court found that none of the conditions alleged by plaintiffs resulted in constitutional violations, and dismissed the claims. *Id*. at 236-53.

Under DOCS regulations, inmates must consent to being housed in a double

cell for more than sixty days, and there exists a screening process, which prevents certain kinds of inmates from being housed together in a double cell. *Jones*, 435 F. Supp. 2d at 230-31, 247-49. In this case, plaintiff appears to challenge the policy as a whole, rather than alleging that **he** suffered some hardship or adverse condition. He merely alleges that this "variance"[26] subjected all Wallkill inmates to constitutionally inadequate conditions and cites numbers of bathrooms, toilets, urinals, and showers. (Compl. ¶ 48). This conclusory allegation, without any specific claim that plaintiff suffered any deprivation, does not rise to the level of an Eighth Amendment violation. Any claim that defendants violated state law or regulations, without more, does not state a constitutional claim. *Salahuddin v. Coughlin*, 781 F.2d 24, 27 n.4 (2d Cir. 1986). Plaintiff's claim about "double-bunking" does not rise to the level of a constitutional violation and may be dismissed.

**7.   Cell Searches and Privacy**

Plaintiff claims that his "quarters and property" were subject to an excessive number of searches. Plaintiff claims that defendant Scott searched plaintiff's cell on March 20, March 26, and May 7, 2008. (Compl. at ¶¶ 52-53). Plaintiff alleges that some of these searches were authorized by defendant Calender. *Id.* at ¶ 53. Plaintiff

---

[26] The court must also note that plaintiff cites the incorrect section of the NYCRR. Plaintiff cites the text of a section governing double occupancy housing units originally designated for "double occupancy" and argues that by converting single occupancy cells to double occupancy, Wallkill violated this regulation. *See* 9 NYCRR § 7621.6-b. The regulations do, however, also provide for "Double occupancy housing units originally designed for *individual occupancy*." *Id.* § 7621.6-a. The regulations contain a formula for maximum facility capacity and provide for an application to the SCOC if a change in maximum facility capacity becomes necessary. 9 NYCRR §§ 7621.10, 7621.11. Thus, the conversion of which plaintiff complains is authorized by the regulations, and the variance is not "void" on its face.

alleges that his cell was searched an additional seven times: May 20, June 18, June 22, July 24, August 6, 7, and 13, 2008. *Id*. at ¶ 55. Plaintiff states that other inmates were similarly searched, and that defendants Rivera, Amado, Jessen, and Neuwirth were advised of the issue at the May 29, 2008 meeting of the Inmate Liaison Committee. *Id*. at ¶ 54. As proof of the excessive nature of these searches, plaintiff argues that while incarcerated at Franklin Correctional Facility for three years, he was subjected to only one random search. *Id*. at ¶ 55.

It is well-settled that the prohibition against unreasonable searches and seizures does not apply to a prison cell. *Hudson v. Palmer*, 468 U.S. 517, 526 (1984. Inmates have no reasonable expectation of privacy in their cells. *Willis v. Artuz*, 301 F.2d 65, 67-69 (2d Cir. 2002); *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239 (S.D.N.Y. 2005). In *Rodriguez*, the court held that an inmate has no right to be free from searches of any kind, including those alleged to be "retaliatory." *Id*. (citing cases).

Plaintiff cites all the occasions when his cell was searched and mentions that other inmates suffered from excessive searches. (Compl. ¶¶ 53-55). He then states that his claim is substantiated "res ipsa loquitur" because he was subjected only to one "random" search in the three years that he was incarcerated at Franklin Correctional Facility. *Id*. ¶ 55. The fact that Wallkill officials choose to search inmates' cells more frequently, even if true, does not change this court's finding. There is no protection from unreasonable searches of one's prison cell. Thus, any cell search claims must be dismissed.

29

8.    <u>**Warming Stove and Other Privileges**</u>

Plaintiff's fifth and sixth causes of action are related to three separate occasions when plaintiff's ***housing block*** lost the privilege to use "warming stoves" in their cells.  (Compl. at ¶¶ 59-72).  Plaintiff also complains about his loss of the privilege to remove bread products from the mess hall. *Id*. at ¶ 91.  Plaintiff argues that the defendants' policy of punishing the entire housing block when defendants are unable to identify who committed some particular misbehavior is unconstitutional.  Plaintiff argues that the deprivation of these privileges must be in accordance with a "constitutionally sound policy," and must not be "arbitrary and capricious" or retaliatory.  Plaintiff is clearly attempting to make a due process argument regarding the denial of these privileges.

Plaintiff cannot make claims on behalf of his "housing block." *See Singleton v. Wulff*, 428 U.S. 106, 114 (1976)(plaintiff cannot assert claims on behalf of other individuals).  However, to the extent that plaintiff is making his own due process claim, the claim must also fail.  In *Sandin v. Conner*, the Supreme Court held that although states may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force . . ., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 483-84 (1995).

In this case, plaintiff is complaining ***only*** about the loss of privileges.  Plaintiff

has *not* alleged that any atypical and significant hardship was imposed upon him. *Sandin*, 515 U.S. at 483-84.  Plaintiff does *not* claim that the loss of the warming stove privilege or that the inability to take bread out of the mess hall was harmful to his health.[27]  There is simply nothing "atypical" or "significant" that would create the right to any particular process prior to losing these privileges.

To the extent that plaintiff uses the word "retaliation," he does not state a constitutional claim.  In order to state a constitutional claim, a plaintiff must allege that the defendants retaliated against plaintiff for the exercise of a constitutional right.  In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for adverse action taken against him by defendants.  *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea*, 313 F.3d 677 (2d Cir. 2002); *Hendricks v. Coughlin*, 114 F.3d 390 (2d Cir. 1997)).  The court must keep in mind that claims of retaliation are "easily fabricated" and thus, plaintiff must set forth non-conclusory allegations.  *Id*. (citing *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002)).

---

[27]Plaintiff also does not state a separate Eighth Amendment claim with respect to this denial of privileges.  He does not claim that the conditions of confinement due to the deprivation of these privileges resulted in an "unquestioned and serious deprivation of basic human needs." *See Jolly v. Coughlin*, 76 F.3d at 480.  Plaintiff does claim that by punishing the entire block, defendants were "endangering the security of the facility." (Compl. ¶¶ 64-65).  Plaintiff appears to claim that defendants were endangering the security of the facility because defendants' actions would pressure the inmates to determine who was the guilty party, fostering unrest among the inmates. *Id.* ¶ 61.  However, plaintiff is speculating about this claimed result of defendants' actions.  Nowhere does he claim that there was ever an incident of inmate unrest due to defendants' actions.

In this case, plaintiff claims that the privileges were initially revoked "in retaliation" for someone leaving a substance on the doorknob. (Compl. ¶ 60). Defendants' alleged "retaliation" had nothing to do with plaintiff exercising a constitutional right.  Thus, plaintiff's claim of denial of privileges must be dismissed.

9.   **Harassment**

Plaintiff alleges that he has been subject to several different kinds of harassment by a number of corrections officers, and that some of the defendants have engaged in a conspiracy to harass plaintiff.  These behaviors include the following allegations:

1.   Defendant Neuwirth told plaintiff that he was "going to have a hard time [at Wallkill]," and wrote a false misbehavior report against plaintiff in conjunction with plaintiff's complaint about being assigned to a double cell. (Compl. at ¶¶ 40-41).

2.   Defendant Heal illegally escorted plaintiff from the mess hall, and searched plaintiff in front of at least twenty other prisoners, in retaliation for plaintiff's filing of grievances against defendant Heal's co-workers. (Compl. at ¶¶ 73-74).

3.   On May 21, 2008, while performing the "evening count," Defendants Heal and Dunham, "stopped in front of plaintiff's room, stood there for 30 seconds looking into the room, while writing on a clipboard." (Compl. at ¶ 79).  Defendant Dunham then accused plaintiff of harassment, and defendant Heal wrote an allegedly false misbehavior report regarding the incident that was "affirmed" after a disciplinary hearing conducted by defendant Galbally. (*Id.* at ¶¶ 82, 86-87).

4.   Defendant Curfman told plaintiff to pull his pants up, causing defendant Heal and other officers to laugh at plaintiff. (Compl. at ¶ 89).

5.   Defendants Roy and Amado failed to prevent the harassment. (Compl. at ¶ 90).

6.      Defendant Curfman instituted a policy prohibiting inmates from taking bread out of the mess hall. (Compl. at ¶ 91).

7.      Defendant Chenneham bumped into plaintiff. (Compl. at ¶ 94).

8.      Defendant Valuc told defendant Scott that plaintiff had his feet on the wall during a telephone conversation, and suggested that defendant Scott should have plaintiff paint the wall as punishment. (Compl. at ¶ 95).

## A.  Verbal Harassment

To the extent that plaintiff alleges that defendants verbally harassed him, whether by threatening to file a Misbehavior Report or suggesting that plaintiff should paint the walls, the claims should be dismissed.  Verbal harassment and name-calling, absent "appreciable injury," simply are not constitutional violations cognizable under Section 1983.  *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986); *Vega v. Artus*, 610 F. Supp. 2d 185, 209 (N.D.N.Y., Mar. 26, 2009).

In his response to defendants' motion to dismiss, plaintiff claims that defendants violated various New York State statutes; regulations; and the DOCS Employee Manual. (Dkt. No. 46).  Even if defendants had violated New York law or the DOCS Employee Manual prohibiting verbal harassment, the violation of state law, absent a constitutional violation, is not actionable under section 1983.[28] *Salahuddin v. Coughlin*, 781 F.2d 24, 27 n.4 (2d Cir. 1986).

## B.  Retaliation

Plaintiff alleges throughout his complaint that defendants retaliated against

---

[28] The court also notes that where the plaintiff lacks a valid federal claim, a district court has the discretion to decline to exercise supplemental jurisdiction over any pendent state law claims. *Matican v. City of New York*, 524 F.3d 151, 154-55 (2d Cir. 1008).

him for filing grievances.  As stated above, in order to establish a claim of retaliation

for the exercise of a constitutional right, plaintiff must show first, that he engaged in

constitutionally protected conduct, and second, that the conduct was a substantial

motivating factor for adverse action taken against him by defendants.  *Bennett v.*

*Goord*, 343 F.3d at 137.

The court in *Dawes* stated that in order to survive summary dismissal, the

plaintiff's "non-conclusory" allegations must establish

> (1) that the speech or conduct at issue was protected, (2) that the
> defendant took adverse action against the plaintiff, and (3) that there
> was a causal connection between the protected speech [or conduct] and
> the adverse action.

239 F. 3d at 492 (citations omitted).  Subsequent Second Circuit cases have held that,

in a prison context, all that is required is that the adverse conduct by defendant

would have deterred a similarly situated individual of ordinary firmness from

exercising his First Amendment rights.  *See Gill v. Pidlypchak*, 389 F.3d 379, 381

(2d Cir. 2004).  In *Gill*, the court held that this objective test applied, even where a

particular plaintiff was ***not subjectively deterred*** and continued to file grievances and

lawsuits.  *Id*.

The filing of grievances is constitutionally protected conduct. *Graham v.*

*Henderson*, 89 F.3d 75, 80 (2d Cir. 1996).  Thus, the court will assume that plaintiff

engaged in "constitutionally protected conduct."  As to the second element of

retaliation, plaintiff has not alleged a single instance of the kind of "adverse action"

that would deter a similarly situated inmate from exercising his constitutional rights.

Most of the "retaliation" that plaintiff alleges is verbal harassment.  Plaintiff

34

described the harassment as being "lambast[ed] . . . with a barrage of threatening, reckless eyeballing and hostile/profane language/jester [sic]." Plaintiff generally alleges that defendants were "mean" to him, that they "eyeball[ed]" him, and even that these conducts constituted "terrorizing conduct." These are not the kinds of unconstitutional "adverse actions" that would make up a retaliation claim.

Contrary to plaintiff's claim that the allegedly "false" misbehavior report written by defendants Heal and Dunham was "affirmed" by defendant Galbally, it is clear from plaintiff's own exhibits that defendant Galbally found plaintiff "not guilty"of two of the charges and only sentenced plaintiff to a seven day work detail. (Compl. *Exhibits* at 42-43). This is not the type of "adverse action" that would deter a similarly situated individual from asserting his rights. Plaintiff makes passing reference to one instance where defendant Chenneham "physically bumped into" plaintiff. (Compl. at ¶ 94). Plaintiff alleges no injury or any adverse consequences whatsoever from the incident. It is unclear how plaintiff claims that this "bump" would have deterred him from asserting his rights. Thus, plaintiff's "retaliation" claims may be dismissed.

## 10.   **Grievances**

Plaintiff's eighth claim is that defendants, defendant Superintendent Rivera in particular, "willfully pervert[ed] state statute [sic] governing Inmate Grievance Program, by unlawfully suppressing all grievances submitted to him by plaintiff." (Compl. at ¶ 98). Plaintiff alleges that defendants Rivera, Henn, and CORC were engaged in a conspiracy to deprive him of his right to grieve his complaints. *Id*. at

¶ 101.

The law is clear that plaintiff has no constitutional right to have his grievances processed at all, or if processed, to have the procedure done properly. *Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003).  A violation of the inmate grievance procedures does ***not*** give rise to a claim under section 1983. *Cancel v. Goord*, No. 00-Civ. 2042, 2001 U.S. Dist. LEXIS 3440 (S.D.N.Y. Mar. 29, 2001).  A claim that defendants improperly or inadequately investigated plaintiff's grievance is not actionable.  *See Davis v. Buffardi*, No. 0:01-CV-0285, 2005 U.S. Dist. LEXIS 45487, 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (Magnuson, J.) ("[p]articipation in an inmate grievance process is not a constitutionally protected right") (citations omitted); *Shell v. Brzezniak*, 365 F. Supp.2d 362, 369-70 (W.D.N.Y. 2005) ("[i]nmate grievance programs created by state law are not required by the Constitution") (citations omitted); *Cancel v. Goord*, No. 00. CIV. 2042, 2001 U.S. Dist. LEXIS 3440, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) ("inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983")(citations omitted).

Because there is no constitutional right to the Inmate Grievance Program, there can be no constitutional violation for officials' alleged failure to abide by the proper procedures.  Plaintiff alleges that because of defendants' alleged "suppression" of his grievances, he submitted all of his "grievances" to the CORC. (Compl. ¶ 98). Plaintiff then complains that the CORC rejected these grievances and returning them to plaintiff and to defendants Rivera and Henn. *Id.*  Rejection of plaintiff's attempt at

sending all of his grievances directly to the CORC is perfectly reasonable.  The CORC is the final appeal for grievances that have been denied at the Superintendent's level. N.Y. COMP. CODES R. & REGS., tit. 7 § 701.5(d).

The court also notes that a review of plaintiff's exhibits shows that plaintiff's letters and "grievances" were not all "suppressed."  Plaintiff received a response to his mail claims and his double bunking claims. (*Exhibits* at 7, 9-10 (mail), 20-25 (double bunking)).  Of the letters that plaintiff labels "GRIEVANCE," many appear to have been sent directly to defendant Rivera or Deputy Superintendent Amado. (*Exhibits* at 20-25; 32-33; 34; 35-37; 40; 44-46; 48-49).  The grievance regulations in New York require that "grievances" be submitted first to the Inmate Grievance Resolution Committee (IGRC). N.Y. COMP. CODES R. & REGS., tit. 7 §§ 701.5(a)(1) and (b).  An adverse decision of the IGRC is then appealed to the Superintendent. *Id.* § 701.5(c).

By submitting claims directly to the Superintendent, the Deputy Superintendent or the CORC, plaintiff was not using the grievance procedure properly and appears to have been attempting to bypass the required steps.  Thus, plaintiff cannot claim that defendants were "suppressing" his grievances.  Thus, his claims that his grievances were somehow "suppressed," or that defendants engaged in a conspiracy[29] to prevent plaintiff from availing himself of the Inmate Grievance

---

[29] Plaintiff sprinkles the entire complaint with allegations of "conspiracy."  He alleges conspiracy under both section 1983 and 1985.  The relevant part of section 1985 provides a narrower protection that section 1983.  Section 1985(3) prohibits conspiracies to deprive persons of equal protection of the law. *Davila v. Secure Pharm. Plus*, 329 F. Supp. 2d 311, 316 (D. Conn. 2004)(citing 28 U.S.C. § 1985(3).  Section 1986 provides that every person who is aware of a conspiracy under section 1985, but does not prevent or aid in preventing the injury, while having

Program should be dismissed.

      **WHEREFORE** it is hereby

      **RECOMMENDED**, that defendant's motion to dismiss (Dkt. No. 41) be

**GRANTED**, and the complaint dismissed in its entirety.

      Pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 72.1(c), the parties have ten

days within which to file written objections to the foregoing report.  Such objections

shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS**

**REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.

*Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of*

*Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1);

Fed. R. Civ. P. 6(a), 6(e), 72.

Date: September 8, 2009

_____
Hon. Gustave J. DiBianco
U.S. Magistrate Judge

---

the power to do so will be liable in damages. 28 U.S.C. § 1986.  A claim under section 1986 is
contingent to a valid claim under section 1985 and must be commenced within one year after the
cause of action accrued. *Id.*

     The protection afforded by section 1985 is "narrower"than that afforded by section 1983
because section 1985 requires the conspiracy to be motivated by a racial or other class-based
animus. *Davila*, 329 F. Supp. 2d at 317.  In order to state a claim under section 1985(3), Plaintiff
must allege a conspiracy for the purpose of depriving him of equal protection; an overt act in
furtherance of that conspiracy; and an injury to plaintiff's person or property, or a deprivation of
a right or privilege of a citizen of the United States. *Id.* (citing *Thomas v. Roach*, 165 F.3d 137,
146 (2d Cir. 1999)).  Mere conclusory allegations of conspiracy are also insufficient to state a
claim under either section 1983 or 1985. *Id. See also Barr v. Abrams*, 810 F.2d 358, 363 (2d Cir.
1987)(section 1983). Plaintiff's claims of conspiracy in this case are completely conclusory and
cannot survive the motion to dismiss.

38